

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

February 19, 2019

BY CM/ECF & HAND DELIVERY

The Honorable Valerie E. Caproni
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

     Re:    United States v. Daniel Rivas,
           17 Cr. 492 (VEC)

Dear Judge Caproni:

     The Government respectfully submits this letter in connection with the sentencing of defendant Daniel Rivas, which is currently scheduled for March 11, 2019, to advise the Court of the pertinent facts concerning the assistance that Rivas has rendered in the investigation and prosecution of others. In light of these facts and Rivas' substantial assistance, and assuming that Rivas continues to comply with the terms of his cooperation agreement, commits no additional crimes before sentencing, and appears for his sentencing as scheduled, the Government intends to move at sentencing, pursuant to Section 5K1.1 of the Sentencing Guidelines, that the Court sentence Rivas in light of the factors set forth in Section 5K1.1(a) of the Guidelines.

<u>Procedural History</u>

     On August 9, 2017, Rivas pled guilty, pursuant to a cooperation agreement, to a five-count information (the "Information").

     Count One of the Information charged Rivas with conspiracy to commit securities fraud and fraud in connection with a tender offer, in violation of 18 U.S.C. § 371, for his participation in a scheme to commit insider trading from in or about August 2014 through in or about April 2017. Count Two of the Information charged Rivas with conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349, also for his participation in a scheme to commit insider trading from in or about August 2014 through in or about April 2017.

     Count Three of the Information charged Rivas with securities fraud in violation of Title 15, United States Code, Sections 78j(b) and 78ff, Title 17, Code of Federal Regulations, Section 240.10b-5, and Title 18, United States Code, Section 2, for his participation in insider trading related to the securities of Covance, Inc., Thoratec Corporation, EMC Corporation, MedAssets, Inc., Airgas, Inc., Alere, Inc., ADT Corporation, Tumi Holdings, Inc., St. Jude Hospital, Inc., Monsanto Company, Elizabeth Arden, Inc., Interactive Intelligence, Inc., Twitter, Inc., Cabela's, Inc., Brocade Communications Systems, Inc., LifeLock, Inc., Macy's Inc., Mead

Johnson Nutrition Company, Panera Bread Company, NPS Pharmaceuticals, ZS Pharma, Inc., the Fresh Market, Inc., Auspex Pharmaceuticals, Diamond Resorts International, Inc., Outerwall, Inc., Medivation, Inc., Raptor Pharmaceutical Corporation, Infoblox, Inc., Nimble Storage Inc., and Air Methods Corporation, from in or about August 2014 through in or about April 2017.

Count Four of the Information charged Rivas with fraud in connection with a tender offer, in violation of Title 15, United States Code, Sections 78n(e) and 78ff, Title 17, Code of Federal Regulations, Sections 240.14e-3(a) and 240.14e-3(d), and Title 18, United States Code, Section 2, for his participation in a scheme to commit insider trading, from in or about August 2014 through in or about April 2017, related to tender offers for the securities of NPS Pharmaceuticals, ZS Pharma, Inc., the Fresh Market, Inc., Auspex Pharmaceuticals, Diamond Resorts International, Inc., Outerwall, Inc., Medivation, Inc., Raptor Pharmaceutical Corporation, Infoblox, Inc., Nimble Storage Inc., and Air Methods Corporation.

Count Five of the Information charged Rivas with a violation of Title 18, United States Code, Section 1001, in connection with his false statements to law enforcement officers in or about April 2017.

<u>Personal Background</u>

Rivas, a thirty-three year old U.S. citizen, immigrated to the United States from the Dominican Republic with his father in 1991 and was raised in the Bronx, New York.  In 2007, Rivas earned an undergraduate degree in philosophy and computer science from Long Island University.  During and following college, Rivas held a series of internships in the financial services industry, including at the New York Stock Exchange and Credit Suisse.  Between 2007 and 2013, Rivas was employed by JP Morgan Chase as an IT business analyst.  In August 2013, Rivas joined the Sales, Research, and Capital Markets Technology Group of Bank of America ("BofA") as a technology project consultant.

Rivas is single and has no children.  He resides with his girlfriend, Kristen Moodhe, through whom he met her father, James Moodhe.  As discussed herein, James Moodhe is one of several individuals to whom Rivas provided material, non-public information ("Inside Information") misappropriated from BofA.

Rivas has no prior arrests and this case represented his first interaction with law enforcement.  Rivas was terminated by BofA in May 2017 as a result of the Government's investigation.

<u>Offense Conduct</u>

A.  <u>Background</u>

The Government's investigation centered on a pattern of suspicious trading ahead of a series of investment banking deals in which BofA played various roles.  The trading began in 2015 and was ongoing in early 2017 when the Government's investigation focused in on Rivas. In his capacity as a technology project consultant at BofA, Rivas was one of a small group of individuals with access to a BofA system containing non-public information regarding hundreds

of deals involving BofA (the "Deal Tracking System").  Records from the system revealed that throughout the relevant period, Rivas frequently accessed the Deal Tracking System to view records concerning non-public transactions of the securities involved in the suspicious trading.  Trading records further revealed timely trading in these securities by at least four individuals who the Government had identified as having a personal connection to Rivas, including James Moodhe and Roberto Rodriguez, Rivas' childhood best friend.

In April 2017, while Rivas was still employed at BofA, the FBI conducted coordinated approaches of Rivas, Moodhe and Rodriguez.  All three lied to the FBI, to varying degrees.  Rivas initially denied any misconduct. However, later in the same approach, after being confronted with certain records from the Deal Tracking System, trading and phone records, Rivas admitted that he had misappropriated Inside Information from BofA and provided it to Rodriguez in order to assist Rodriguez financially.[1]  Rivas continued to deny providing Inside Information to anyone else, including specifically Moodhe.  BofA subsequently terminated Rivas.

<u>Rivas' Substantial Assistance</u>

A.  <u>Information</u>

Less than a week after Rivas was approached by law enforcement, he retained an attorney who promptly contacted the Government to offer Rivas' full and immediate cooperation.  In the following days and weeks, Rivas participated in a series of detailed proffers in which he candidly admitted serially misappropriating Inside Information about BofA deals from the Deal Tracking System in order to pass Inside Information in three different tipping chains, as discussed in detail below.  Rivas also explained in detail the ways in which he had attempted to avoid detection by, for example, using Wikr, a texting app which automatically erases text messages after they are received, in-person meetings and handwritten notes.  Rivas described how he used these covert methods to disclose ticker symbols, enterprise values, and expected announcement dates concerning dozens of non-public transactions.  Rivas' proffer corroborated records from the Deal Tracking System, as well as trading and phone records, and text messages compiled in this case. Rivas also provided the Government with certain corroborating evidence, including encrypted messages and emails.

In total, Rivas explained how he provided Inside Information misappropriated from BofA to at least four individuals in three different tipping chains, including to (a) James Moodhe (the father of Rivas' girlfriend and a senior executive at a global interdealer broker); (b) Roberto Rodriguez (Rivas's childhood friend); (c) Rodolfo Sablon (an acquaintance Rivas met through Rodriguez); and (d) Jhonatan Zoquier (Rivas' then best friend and Union Worker).   The Government identified at least an additional five individuals downstream of the direct tippees who also traded profitably in relevant stocks, as outlined below.  These downstream tippees included Michael Siva, a broker at Morgan Stanley who used information he received from Moodhe to execute more than $2 million in profitable trade for his clients and himself, and Jeffrey Rogiers, a

---

[1]   Throughout the relevant period, Rivas participated in trainings, reviewed manuals, and signed multiple acknowledgements concerning his duty to refrain from using confidential bank information for his personal benefit and, more specifically, from trading on or recommending that others trade on material nonpublic information.

friend of Zoquier's who traded on the Inside Information and shared it with at least two other individuals who also then traded.

### 1. *The Rivas-Moodhe-Siva Tipping Chain*

In 2013, Rivas entered into a romantic relationship with Kristen Moodhe ("Kristen"), the daughter of James Moodhe ("Moodhe"). As the relationship progressed, Rivas came to know Moodhe. Until June 2017 when he was terminated as a result of the Government's investigation, Moodhe was a registered broker and the longtime Treasurer and Comptroller at a global interdealer broker headquartered in New York and London.

Beginning in October 2014 and continuing throughout the relevant period, Rivas systematically passed Inside Information to Moodhe. In December 2015, in the midst of the scheme, Rivas and Kristen moved in together. Rivas often tipped Moodhe during in person meetings at their respective residences. Rivas also provided Moodhe with handwritten notes, some of which were passed through Kristen. Rivas provided the tips to help Moodhe financially in view of Moodhe's upcoming retirement and to strengthen his relationship with his girlfriend's family.

As an example, the first tip from Rivas to Moodhe concerned the impending acquisition of Covance Inc. ("Covance") by Laboratory Corporation of America Holdings ("LabCorp"). The following timeline reflects Rivas' access to the Deal Tracking System regarding the Covance transaction and Moodhe's trading in Covance securities on the basis of the tip from Moodhe.

| Date and Time | Event |
|---|---|
| 10/23/2014 2:42 p.m. | Rivas first views the Deal Tracking System for records reflecting impending acquisition of Covance. |
| 10/26/2014 4:36 p.m. | Rivas views Covance Deal Tracking System records again. |
| 10/27/2014 9:51 a.m. | Moodhe buys 500 shares of Covance at approximately $80 per share (cost: $40,332). Moodhe had no known prior trading history in Covance. |
| 10/28/2014 10:04 a.m. | Moodhe buys 500 shares of Covance at approximately $81 per share (cost: $40,522). |
| 11/03/2014 6:00 a.m. | LabCorp and Covance announce definitive agreement under which LabCorp will acquire Covance for $105.12 per share. |

| 11/03/2014 9:37 a.m. | Moodhe sells 1,000 shares of Covance stock at approximately $100 per share for a profit of $19,142 (a 23% return). |
|---|---|

Over the following two and a half years, Rivas continued to pass Inside Information to Moodhe on a frequent basis, including as recently as March 2017, the month before the FBI approached Rivas. In total, Rivas tipped Moodhe regarding more than three dozen transactions. Overall, Moodhe realized approximate total profits of more than $2 million by trading in more than two dozen securities.

The Government's investigation also identified suspicious trading by Michael Siva, a broker at Morgan Stanley, personally and in client accounts. Based on the Government's analysis of trading and phone records, the Government believed Moodhe was tipping Siva. While Rivas could not directly confirm this fact, Rivas' cooperation caused Moodhe to retain a lawyer and offer to cooperate in the investigation of Siva. Moodhe then made secret recordings of meetings with Siva that substantially assisted in the Government's ability to charge Siva. In August 2017, Moodhe pleaded guilty pursuant to a cooperation agreement. *United States v. James Moodhe*, 14 Cr. 491 (VM). He will be sentenced on a date to be determined by Judge Marrero.

In total, between 2015 and 2017, Moodhe tipped Siva to more than two dozen transactions. Overall, Siva realized for his clients approximate total profits of more than $1 million, and earned thousands of dollars in illegal commissions.

### 2. The Rivas-Rodriguez/Sablon Tipping Chain

From at least December 2015 until April 2017, Rivas also repeatedly passed Inside Information to Roberto Rodriguez (Rivas' childhood friend) and Rudy Sablon (Rodriguez's friend and colleague and Rivas's friend). During this time, both Rodriguez and Sablon resided in Miami, Florida.

In October 2015, during a vacation in Las Vegas, Rodriguez explained to Rivas that his tutoring business was struggling and stated that he had considered trading securities as a source of income. Rivas agreed to help Rodriguez, who had no experience trading, by providing him with tips from BofA. The primary reason he tipped Rodriguez was because Rivas wanted to help his longtime friend. Rodriguez then brought Sablon, his friend and colleague, into the fold and the two opened brokerage accounts and began trading. Shortly thereafter, Rivas traveled to Miami and had lunch with Rodriguez and Sablon. At the lunch, Rodriguez, Sablon, and Rivas discussed plans to trade on the basis of tips from Rivas and to start an investment fund with the proceeds of the illegal scheme. Rodriguez and Sablon told Rivas that if the scheme went well, he could join them in the future to manage the fund.

In addition to providing information in-person, Rivas passed tips to Rodriguez and Sablon via electronic means. At first, they sometimes communicated via phone calls and text messages. In early 2016, Rivas, Sablon, and Rodriguez largely ceased communicating by phone. Rivas tipped Rodriguez and Sablon through an encrypted mobile messaging application called

Wikr.  Rivas liked Wikr because it allows users to set a timer for messages to irretrievably "self-destruct."

In total, Rivas tipped Rodriguez and Sablon to more than three dozen relevant transactions.  As the scheme progressed, Rodriguez and Sablon often purchased short-term, out-of-the money call options to capitalize on the tips.  Collectively, approximately 80% of all the securities Rodriguez and Sablon traded from the time they first opened brokerage accounts in December 2015 until April 2017 were based on Inside Information obtained by Rivas through the Deal Tracking system.  In total, Rodriguez and Sablon realized more than $2 million by trading in nearly two dozen securities.

### 3.   The Rivas-Zoquier-Rogiers Tipping Chain

Beginning in mid-2015, Rivas also began passing Inside Information to Jhonatan Zoquier, a friend of Rivas' who resided in New Jersey and with whom Rivas, until the arrests in this case, shared a passion for bodybuilding.  Zoquier, a college graduate, is employed as a Union Representative for the United Food Workers Union.  Rivas and Zoquier were very close; Rivas frequently referred to Zoquier as his best friend.  During the relevant period, Rivas purchased an engagement ring for Zoquier to use in proposing to his girlfriend.  According to Rivas, he passed Inside Information to Zoquier because he wanted to help Zoquier make money in preparation for his upcoming wedding.  To avoid detection, Rivas and Zoquier also frequently discussed Inside Information in encrypted messages sent via Wikr.

Overall, Zoquier traded in more than a dozen relevant securities on the basis of tips from Rivas (representing approximately 70% of all securities Zoquier traded from March 2016 until April 2017).  Because Zoquier was trading with less capital than the individuals in the tipping chains discussed above, he profited less from the scheme, realizing approximately $31,000 from trading in nine relevant securities.

Zoquier also provided the Inside Information to Jeffrey Rogiers, a 33 year-old computer and network security analyst residing in San Francisco, CA.  Zoquier and Rogiers were close friends. Zoquier served as a groomsman in Rogiers' May 2017 wedding.  Rogiers and Rivas were introduced by Zoquier during a vacation Rivas took with Zoquier to California in approximately 2013.  In mid-2015, Zoquier asked Rivas if he would meet with Rogiers in New York about the possibility of sharing Rivas' Inside Information with Rogiers.  Rivas agreed because of his close relationship with Zoquier.  At the meeting, Rivas explained the nature of the Inside Information to which he had access.  At the time, Rogiers told Rivas that he was currently doing well financially and did not need access to the Inside Information.  Rogiers also stated that because he lived in California (and Rivas in New York), it might be difficult for Rivas to surreptitiously pass the Inside Information to Rogiers.  Rivas and Rogiers had no further communication.

In approximately March 2016, however, trading records for Rogiers reflect that he began executing profitable trades in the stocks of issuers Rivas had passed to Zoquier.  Brokerage records for Rogiers reflect that he opened two brokerage accounts in his own name and immediately began trading in relevant securities about which Rivas had tipped Zoquier.  Overall, Rogiers traded in ten relevant securities on the basis of tips from Zoquier from March 2016 until

April 2017.  Rogiers personally placed profitable trades in four relevant securities and realized approximate total profits in excess of $50,000.

### 4.  Downstream Tippees

The Government's investigation indicates that Rivas' information was used by at least four downstream tippees to generate a total additional profit of more than $500,000.  Rivas had no contact with or knowledge of these individuals, none of whom have been charged.  More than $450,000 of these profits were earned by individuals believed to have obtained the Inside Information from Rogiers.

### B.  Why Rivas Did It

The Government's investigation did not identify evidence that Rivas had himself traded on the misappropriated Inside Information, nor that Rivas had received any financial benefit in exchange for providing this information.  Consistent with this, Rivas proffered to the Government that he did not receive financial compensation from any of the tippees in this case.  Rivas further described the close and personal relationship he had with each of his direct tippees.  He explained that he provided Inside Information because of these close relationships and out of a desire to assist each financially.  However, as noted above, with respect to Rodriguez and particularly Sablon (who was more of an acquaintance), Rivas hoped to gain a stake in an investment fund Rodriguez and Sablon intended to start.

### C.  Proactive Cooperation

In addition to providing detailed information about the insider trading schemes and their participants, Rivas also made a series of consensual recordings.  Specifically, Rivas made recordings with Zoquier and a recording with Rogiers.

The recordings further assisted the Government's investigation.  For example, in the Rivas-Zoquier recordings, Zoquier acknowledged knowing that the stock tips provided to him by Rivas were confidential information from a BofA system.  Rivas and Zoquier also discussed the FBI's investigation and Zoquier's intention to state, if questioned, that his trades were placed based on information available in the public domain.  Zoquier acknowledged, however, that because there was no information in the public domain about St. Jude, whatsoever, it will be impossible to offer that rationale if questioned about the St. Jude's trading.  (Zoquier: "There is no rationale, I mean that, it is what it is for that one.")  Zoquier also admitted that he passed the Inside Information to Rogiers.  (Zoquier: [T]he thing is like to me—based on what you gave me—obviously you past me some messages I would pass it on to Jeffrey, right.")  In the recording Rivas made with Rogiers, Rogiers also acknowledged receiving information from Zoquier.  (Rogiers: Jay would also tell me tickers.")  In sum, the admissions Zoquier and Rogiers made on these calls assisted the Government's investigation and ability to charge both men.

### D.  Use of Information

Six defendants were charged based in part on information provided by Rivas.  On August 15, 2017, a Grand Jury sitting in the Southern District of New York returned a 54-Count

Indictment (the "Indictment") against Siva, Rodriguez, Sablon, Zoquier and Rogiers. *United States v. Michael Siva et al.*, 14 Cr. 503 (AJN). All pleaded guilty after receiving Rule 16 discovery and learning that Rivas was a cooperating Government witness.[2] The sixth defendant, James Moodhe, was charged by information and, as noted above, is cooperating with the Government.

## Section 5K1.1 Factors

Section 5K1.1(a) of the Guidelines provides that the Court is to consider the following five, non-exclusive factors in deciding upon "[t]he appropriate reduction" from the otherwise applicable sentencing range. The application of each of those factors to Rivas' cooperation is set forth below.

1.   *"[S]ignificance and usefulness" of assistance (§ 5K1.1(a)(1)).* Rivas' cooperation to the Government was significant and useful. While the Government had strong evidence of insider trading based on trading records, records from the Deal Tracking System, and phone and text messages, Rivas provided the Government with a narrator who detailed how the schemes unfolded and provided direct evidence, including in the form of the recordings, that his co-conspirators had knowingly committed insider trading. As a result, in August 2017, just months after Rivas was initially approached by law enforcement in April 2017, Rivas and Moodhe had pleaded guilty pursuant to cooperation agreements and a grand jury had returned a 54-count indictment against five additional defendants. In sum, Rivas' substantial assistance supported charging six individuals with insider trading.

Furthermore, in the Government's view, the combination of Rivas' testimony alongside the documentary evidence and the recordings caused all defendants to plead guilty rather than go to trial. It is also the case that Moodhe likely cooperated because he knew that Rivas' cooperation meant that Moodhe would be charged. And without Moodhe's cooperation, including recordings of meetings with Siva, Siva may also not have been charged.

2.   *"[T]ruthfulness, completeness, and reliability" of information and testimony (§ 5K1.1(a)(2)).* While Rivas initially lied to law enforcement when approached, he quickly reversed course and provided the Government with a detailed account of the schemes. In addition, much of the information and testimony provided by Rivas was corroborated by other documentary evidence and the testimony of other witnesses.

3.   *"[N]ature and extent" of assistance (§ 5K1.1(a)(3)).* As noted above, the nature and extent of Rivas' assistance was significant and essential, resulting in charges and guilty pleas of six defendants.

4.   *"[A]ny injury suffered, or any danger or risk of injury to the defendant or his family" resulting from assistance (§ 5K1.1(a)(4)).* This category is not applicable.

---

[2] In December, Rogiers was sentenced to 3 months' imprisonment. No other defendants have been sentenced as of February 19, 2019.

5.   *"[T]imeliness" of assistance (§ 5K1.1(a)(5))*.  While Rivas initially lied to law enforcement, he reversed course almost immediately.  Most critically, Rivas provided timely assistance while the Government's investigation was still covert and there was an opportunity for proactive cooperation and evidence gathering, such as conducting consensually recorded conversations.

<u>Conclusion</u>

As set forth above, the Government believes that Rivas provided substantial assistance to the Government.  The Government therefore expects to request at sentencing that the Court sentence him in light of the relevant facts stated above and the factors set forth in Section 5K1.1 of the Sentencing Guidelines.

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney


By:_____/s/_____
    Andrea M. Griswold
    Assistant United States Attorney
    212-637-1205

cc:    Defense Counsel